IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

VINEYARD BRANDS INC., a California Corporation,

    Plaintiff,

v.

VIÑA DOÑA PAULA S.A., an Argentina Corporation, and VIÑA SANTA RITA, S.A., a Chile Corporation,

    Defendants.

No. C 11-00589 WHA

**ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS AND ALLOWING JURISDICTIONAL DISCOVERY**

**INTRODUCTION**

In this contract dispute regarding the importation of Doña Paula wines, defendant Viña Santa Rita S.A. moves to dismiss all eight claims for lack of personal jurisdiction and failure to state a claim. Defendant Viña Doña Paula S.A. moves to dismiss claims two through eight for failure to state a claim. For the reasons set forth below, the motions are **DENIED**. The personal jurisdictional question will be held in abeyance until a factual record is developed.

**STATEMENT**

Defendants Santa Rita and Doña Paula are a Chilean and an Argentine corporation, respectively. Doña Paula is a subsidiary of Santa Rita; both defendants operate wineries. Doña Paula has recently become the third largest exporter of Argentine wine in the United States — allegedly earning that title in part due to the efforts of Vineyard Brands. From 1987 to 2006,

plaintiff Vineyard Brands imported and sold Santa Rita's Chilean wines in the United States (Compl. ¶ 19). The complaint states that in 2002, Santa Rita representatives asked Vineyard Brands to start importing Doña Paula wines, which at that time had no presence in the United States (Compl. ¶¶ 23–24). From 2002 to 2010, Vineyard Brands was the sole United States importer of Doña Paula wines (Compl. ¶ 23).

During those nine years, Vineyard Brands avers that it invested over $12 million in promotion for Doña Paula wines (Compl. ¶ 23). Plaintiff further alleges that its representatives advised Doña Paula's winemaker by sharing expertise and strategies for making wine that appealed to the United States market (Compl. ¶¶ 24–26). Their collaboration paid off. By 2009, Doña Paula had become the third largest exporter of Argentine wine in the United States. By 2010, Doña Paula was — for the third year in a row — one of *Impact* magazine's "Hot Prospects" (Compl. ¶ 27). Vineyard Brands promoted Doña Paula wines throughout 2010 and was planning to continue its promotional efforts when defendants terminated the importer relationship in 2011 (Compl. ¶ 42).

Although there was no written agreement, Vineyard Brands alleges that oral agreements and partially memorialized written communications formed a contract with defendants to import Doña Paula wines (Compl. ¶ 48). Plaintiff alleges that in exchange for the exclusive long-term importing rights to Doña Paula wines, it agreed to use its best marketing efforts, pay for half of the promotion costs, and not import any other Argentine wine (Compl. ¶¶ 30–31).

Vineyard Brands relied on statements from both Doña Paula and Santa Rita executives to confirm its belief that a long-term relationship existed and merited its enormous investment of time, labor, and money (Compl. ¶ 35). For instance, the complaint states that in 2009, Carlos Trad, Doña Paula's export director, emailed plaintiff writing, "we are very happy to be represented by VB [Vineyard Brands]" (Compl. ¶ 34). Plaintiff avers that a year later, Salvador Domenech Venturini, an executive for Santa Rita and Doña Paula, discussed in detail the parties' ongoing joint venture with Vineyard Brands' executive Christopher Marshall (Compl. ¶ 38). During this discussion, the two executives allegedly talked about how Doña Paula's delays in shipments were negatively affecting Vineyard Brands' marketing efforts

1 (Compl. ¶ 38). The complaint avers that a couple days later, Domenech sent an email
2 apologizing for the delays, thanking Vineyard Brands for its patience, and marking May 2010
3 as "a new beginning for our relationship" (Compl. ¶ 39).

4 Plaintiff alleges that defendants started planning a new importer relationship in 2009
5 (Compl. ¶ 47), but that defendants did not mention this possibility until January 4, 2011
6 (Compl. ¶ 43). In a phone call subsequently memorialized in an email, Domenech supposedly
7 stated that defendants "decided not to continue taking any new purchase orders from Vineyard
8 Brands . . . effective immediately" (*ibid.*). The email suggested that the transition be finalized
9 by February 28, 2011 (*ibid.*). On January 26, 2011, Silvio Rostagno, CEO of the Claro Group,
10 which owned Santa Rita and thus its subsidiary Doña Paula, announced that Trinchero Family
11 Estates, a California wine producer, would be representing Doña Paula wines in the United
12 States (Compl. ¶ 46).

13 Vineyard Brands alleges that it was injured by the abrupt termination of its importation
14 relationship with Doña Paula. Plaintiff invested large sums of money and time into importing
15 and marketing Doña Paula wines with the belief that it would recoup its investment through a
16 long-term relationship with defendants. Plaintiff alleges that it lost this investment and its
17 future earnings from the sale of Doña Paula wines, and it must now renew efforts to build a
18 relationship with another Argentine wine producer.

19 **ANALYSIS**

20 This civil action arises out of a long-term commercial relationship wherein the parties
21 chose to abandon formal contract negotiations and instead gambled on later litigation to
22 determine their rights and duties. Meanwhile, a series of orders of goods was made and filled
23 — one shipment at a time, over several years. At trial, a good case perhaps can be made that
24 nothing more than a series of stand-alone sales between merchants was involved. Now that the
25 relationship has cratered, however, the disappointed side would like a chance to persuade a jury
26 that it should enjoy contractual rights it never got in writing.

27 While one may be skeptical of such a claim, the complaint alleges enough, if credited
28 and liberally construed, to establish that at least some oral promise was made to terminate the

3

relationship only upon reasonable notice. That defendants orally agreed, however, to reimburse plaintiff upon termination for all brand-development investments is too fantastic a proposition, even on the exhaustive facts as pled. Perhaps some or all of these expenses, however, can be recovered as damages for a breach of an oral contract adequately pled. Claims one and two will be allowed to go forward. Caveat: that the covenant of good faith and fair dealing is not a basis for a separate claim sounding in contract but is simply part of the contract claim and will henceforth be treated as such.

As for the joint venture claim, the same critique applies. A written joint venture agreement could have and should have been drawn and signed but this important matter was left to the chance of litigation. Still, liberally construed, enough has been alleged to eke out a plausible joint venture claim. A good argument can be made — and is made — that the relationship was nothing more than a series of sale-and-resale transactions, that there was no profit-sharing, that plaintiff could not control the price charged by defendant, and that a joint venture could not be found. All good issues. But which law applies in defining a joint venture? Counsel have not assisted in this regard. For the time being, the Court cannot say as a matter of whatever law applies that, liberally construed, the allegations cannot support a joint venture of some sort. The discovery on the contract claim will be the same as discovery on this issue, so the practical course is to sort this issue out after a reasonable opportunity for discovery and after we learn what state or country's law governed the relationship.

As for the misrepresentation and concealment claims, Rule 9(b) is satisfied. It seems clear, if the allegations are credited, that defendants intentionally and affirmatively led plaintiff to invest its time and money in special promotions of the brand while concealing a secret intent, once they reaped the benefit of the investment, to drop plaintiff like a hot potato and go with a different distributor. Specific and pertinent misleading emails are quoted (*see* Compl. ¶ 39). This is adequate.

As for unjust enrichment, this cannot be a stand-alone claim but it is merely a form of equitable relief. Now is premature to rule it out of the case, so as a concession to the shortness of life, claim seven will stand and simply be treated as a prayer for relief.

4

The last claim for declaratory relief seeks to establish that plaintiff may withhold its payment for the last few shipments as an offset. This is enough of an actual controversy to be left alive in the case.

As for Santa Rita's motion to dismiss for lack of personal jurisdiction, it seems true that most of the contacts with plaintiff were with Doña Paula, not Santa Rita, but still, there were a considerable number of contacts and alleged manipulative acts by officers and employees wearing Santa Rita hats or at least so a jury could reasonably conclude on the present record, liberally construed. Before deciding the ultimate jurisdictional question, discovery should go forward on the jurisdictional issue at the same time as discovery on the merits. A supplemental submission and motion to dismiss on this ground may be made after an adequate opportunity for discovery.

**CONCLUSION**

For the reasons set forth above, defendants' motions to dismiss are **DENIED** without prejudice to a renewed motion to dismiss for lack of personal jurisdiction after jurisdictional discovery has been completed. In the interim, jurisdictional discovery will proceed alongside fact discovery. Failure to cooperate in discovery may be deemed as an admission to the relevant issue by the non-cooperative party. The answer is due in **TEN CALENDAR DAYS**.

**IT IS SO ORDERED.**

Dated: June 17, 2011.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

5